[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
This is the matter of Maelen Z. Maelen is a girl born on July 6, 1986. Her father is Andrew W.
On January 15, 1992 the Commissioner of the Department of Children and Youth Services (Now the Department of Children and Families, "DCF" and "The Commissioner") filed a petition seeking to terminate Andrew W.'s parental rights as to Maelen.
As grounds for termination the petitioner alleges:
1) The child has been abandoned by her father in the sense CT Page 2289 that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;
2) There is no on-going parent-child relationship with respect to the father, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child; and that to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the child.
Further, that the grounds for termination of father's parental rights have existed for a least one year.
 II.
Maelen first came to the attention of this court on July 11, 1988 when the Commissioner filed a petition alleging that Maelen was a neglected child. Maelen was adjudicated neglected on March 1, 1989 following trial and on April 24, 1989 she was committed to the care and custody of the Commissioner. That commitment has been extended periodically and the child remains committed to date. The child was moved to a second placement in August of 1989 and in April, 1990 she was placed with her present foster family, the Fs.
A petition was filed on October 9, 1990 to terminate her mother's parental rights. At that time the child's father was listed as unknown.
On September 20, 1991 Andrew W. acknowledged paternity of Maelen before this court. The Commissioner then filed the instant petition, as indicated, supra, on January 15, 1992.
On July 2, 1992 Andrew W. moved for a separate trial, which motion was granted on July 9, 1992. Mother's parental rights were terminated on December 17, 1992.
A hearing on the petition to terminate father's parental rights opened on May 24, 1993, continued on June 7th and July 26th and the parties rested on October 18, 1993. Trial briefs were filed on behalf of the parties by November 8, 1993. In the course of the hearing testimony was had from David M. Mantell, PhD., [Ph.D.] a licensed clinical psychologist; Bessie Byrd, a DCF social worker; and Dr. Tonia K. Shamoo, a licensed psychologist. Andrew W. testified on his own behalf and also called Harriet Blinn, a DCF foster mother, as a witness. CT Page 2290 III.
The termination of parental rights is "a most serious and sensitive Judicial action", In re Jessica M., 217 Conn. 459 at 464, quoting from Anonymous v. Norton, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S Ct. 294, 46 L.Ed.2d 268 (1975). The interest of parents in their children is a fundamental constitutional right, In re Jessica M., supra, at 464. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. In re Jessica M., supra, at 465, quoting from Santosky v. Kramer, 455 U.S. 102 S.Ct. 1388,71 L.Ed.2d 599 (1982).
To effectuate a non-consensual termination of parental rights a petitioner must first prove, by clear and convincing evidence, the existence of a least one of the statutory grounds for termination set forth in General Statutes, Section 17a-112. "Consideration of the best interests of the child cannot vitiate the necessity of compliance with the statutory criteria for termination," In re Jessica M., supra, at 465; In re Barbara J., 215 Conn. 31, 45. Nor can the court consider the availability of an appropriate adoptive home as bearing on the issue of establishing a statutory ground for termination, In re Jessica M., supra, at 466.
If a statutory ground for termination is so established, the court must proceed to make the six written findings required by General Statutes, Section 17a-112(d) before moving on to determine whether termination of parental rights is in the best interest of the child. At this dispositional stage, the petitioner must prove, by clear and convincing evidence that the termination sought is in the child's best interest.
 IV.
The court makes the following findings of fact, by clear and convincing evidence:
Maelen's father, Andrew W., was 32 years old at the time of trial.
He is a high school graduate and served in the U.S. Marine Corps. He has been steadily employed since his return to civilian life. He suffered from physical and sexual abuse as a child.
At the time of Maelen's birth he resided with Maelen's mother and CT Page 2291 her two sons by another man. Andrew did not acknowledge paternity of Maelen at this time as he did not want to be responsible for Maelen's health benefits. In January, 1988 Andrew was arrested and charged with two counts of Risk of Injury and two counts of Assault in the 3rd Degree in connection with his alleged mistreatment of Maelen's half brothers. As part of the resolution of these charges Andrew was ordered out of the house.
From the time he left the house until Maelen's commitment and placement in April, 1989 Andrew took Maelen every other weekend and contributed to the support of the mother's household. He remembered the child on such occasions as birthdays and Christmas, and continued to do so following placement.
In the year following Maelen's placement Andrew visited her once. He judged that mother's chances of regaining custody of Maelen would be better if he stayed out of the way. Starting circa May, 1990 Andrew visited Maelen about once a month for some six months. In October, 1990 a petition was filed by the Commissioner, seeking termination of mother's parental rights.
By the summer of 1991 Andrew would see Maelen every other week on their visits to the Blinn foster home to see Maelen's half brother. Following Andrew's acknowledgement of paternity in September, 1991 he had about six visits with Maelen in the period September through December. Visitation was suspended by DCF in January, 1992 because of what was perceived as the deleterious effect such visitation was having on the child. Acting on a motion by father and by agreement of the parties the court ordered a supervised visit, which took place in May, 1992.
Maelen was approximately seven years and four months old at the time of trial. She was approximately 18 months old when her father left the home. She has been in foster care since she was two years and nine months of age. Since April of 1990 she has lived with the F. family. She is strongly "bonded" to the Fs., whom she refers to as "Mom" and "Dad". By the Fall of 1991 Maelen was increasingly resistant to visitation by her biological parents. Her distress was evidenced by bedwetting, sleeplessness, psychosomatic complaints, weepiness and an inability to concentrate. Andrew W. testified that he noted a dramatic change in the child's attitude toward him in the Fall of 1991. A great distance had developed between them. Maelen was very unresponsive to him. Andrew testified that any on-going relationship between him and Maelen ceased by late 1991. He attributed this to manipulation by the Fs. Dr. Shamoo, the child's therapist, concluded that the child's CT Page 2292 distressed behavior and her resistance to visitation were caused by the anxiety she felt at the prospect of losing her foster parents.
 V.
In her petition to terminate Andrew W.'s parental rights the Commissioner alleges two grounds. The first of these is abandonment, defined by statute as the failure by the parent to maintain a reasonable degree of interest, concern or responsibility for the child. Abandonment focuses on the parent's conduct, In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14. The statute does not contemplate a sporadic showing of the indicia of "interest, concern or responsibility for the welfare of a child: A parent must maintain a reasonable degree of interest in the welfare of his or her child." `Maintain" implies a continuing, reasonable degree of concern." In re Rayna M., 13 Conn. App. 23,38, 39, (citation omitted).
With the benefit of hindsight it is clear that at every critical juncture of his daughter's life Andrew W. made decisions detrimental to his maintaining the requisite interest, care and concern for Maelen. He failed to acknowledge paternity at her birth, thus failing to establish a legal relationship to his daughter. He failed to make such acknowledgement at the time he was removed from the home so his relationship to Maelen was not addressed by the court at that time. He failed to make such acknowledgement at or before the time the child was committed and did not offer himself as a resource for the child. There was nothing, he felt, he could do. Once the child was committed he chose to have minimal contact with the child for a period of a year, feeling mother would have a better chance of regaining custody of Maelen if he stayed out of the way. Only when things went badly for mother and the prospect of a petition to terminate her parental rights loomed, did Andrew seek to re-establish contact with the child. Based on the evidence presented, however, the court cannot find, by clear and convincing evidence that Andrew W. abandoned his daughter Maelen.
The second statutory ground alleged for termination of Andrew W.'s parental rights is that of no on-going parent-child relationship. This relationship is defined by statute as "the relationship which ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child". It is undisputed that Andrew W. failed to meet such needs of Maelen for much of her life. Andrew has been a non-custodial parent since her commitment to the care and custody of the Commissioner and for many months prior to her commitment. Our Supreme Court has concluded that the application of this statutory ground to a non-custodial parent CT Page 2293 requires a finding that no positive emotional aspects of the relationship survive, In re Jessica M., 217 Conn. 459, 470.
The court finds by clear and convincing evidence, that Maelen retains no positive emotional ties to, nor feelings for her father, Andrew W. Father testified that he believed he had no on-going relationship with Maelen. He felt such relationship had ceased by late 1991. Andrew described Maelen as "very unresponsive" during a visit at the F.s and during a visit in October, 1991: "She was totally undesirous of us being there". During 1991 Maelen developed a variety of psychosomatic complaints and behavioral difficulties, including sleeplessness, bedwetting, weepiness and irritability. Dr. Shamoo, who became Maelen's therapist in October, 1991, attributes these problems to fear of losing her foster parents, the F.s with whom she has "bonded". Maelen is fearful of going with her biological parents.
In his evaluation, conducted in October, 1991, Dr. Mantell observed no interaction between father and child. Taking into account father's limited visitation with Maelen, Dr. Mantell still found their lack of "connection" surprising. He would have expected to see manifestations of mutuality, interest, relatedness, strong interaction. Instead he saw "no connection". When questioned as to the possible influence of the foster mother on the relationship between father and child Mantell testified he had detected no overt interference that blatantly interfered with the father-child relationship such as to warrant further inquiry.
Mantell did allude to one comment of the child which arguably suggests some vestige of positive feelings of Maelen toward father. Maelen was asked a series of questions regarding her feelings toward her biological mother, Linda and her biological father, Andy. When asked if she likes to see her mom, Linda and her dad Andy, she replied, uh, huh. I want Linda to be my friend. In answer to further questions the child stated she did not love them, she did not want to kiss or be kissed by them, she did not want to live with them (biological parents). Given the overwhelming evidence to the contrary and the ambiguity inherent in the coupling of Linda and Andy in the question, the court concludes that this answer does not suffice to establish the existence of positive feelings of the child for her father.
The court finds, by clear and convincing evidence, that as of the date of the filing of the instant petition there was no on-going parent-child relationship between Maelen and her father, Andrew W.
The petitioner has alleged that the ground for termination has CT Page 2294 existed for not less than one year. It is not possible to mark with precision the moment the last vestige of positive feeling of this child for her father was extinguished. The court finds, by clear and convincing evidence, from the totality of the circumstances surrounding the child that a waiver of the one year requirement is necessary to promote the best interest of the child.
The court must also determine, by clear and convincing evidence, whether allowing further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of Maelen. The father has not been a care-taker for Maelen since January, 1988. Whatever positive feelings the child might have had for Andrew have evaporated to nothingness over time. She has consistently and emphatically stated that she did not want to live with Andrew. Since 1991 she has exhibited great distress, evidenced by psychosomatic complaints as well as behavioral difficulties. These difficulties are seen by her therapist as linked to visits by father, which the child finds threatening. Dr. Shamoo warned of the deleterious effects on the child of continued visitation by father. Dr. Mantell warned that efforts to reunite this child with her father would be detrimental to the child. The psychological testimony of professionals is rightly accorded great weight in termination proceedings, In re Nicolina T., 9 Conn. App. 598, 605; In re Juvenile Appeal (Anonymous),177 Conn. 648, 667. The court finds, by clear and convincing evidence, that to allow further time for the establishment or reestablishment of this parent-child relationship would be detrimental to the best interest of Maelen.
 VI.
Pursuant to General statutes, Section 17a-112 (d), the Court makes the following finding, by clear and convincing evidence:
(1) the timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent: Immediately following father's acknowledgement of parenity (9/20/91) DCF sought in timely fashion to arrange a visitation schedule for father and such schedule was established.
(2) Father participated in a court-ordered evaluation and also participated in a court-ordered supervised visitation.
(3) The child has strong, positive emotional ties to her foster parents, the F.s., with whom she wishes to live. The shild [child] has indicated she does not wish to live with or visit her biological father; CT Page 2295 any positive feelings she may have had toward father have evaporated.
(4) Maelen was 7 years 4 months old in November, 1993.
(5) Father visited Maelen every other weekend from the time he was ordered out of the home (January 1988) to the time the child was placed by DCF (April 1989). Father visited the child once in the year following placement. Father visited Maelen every other week in the summer of 1991. He had approximately six visits in the last four months of 1991. Visitation was thereafter suspended by DCF. A court-ordered supervised visitation took place in May 1992. Father remembered the child on such occasions as birthdays and Christmas with gifts. Father has established a home with Maelen's birth mother and their two year old son. The apartment is described as adequate for children and clean.
(6) Father has not been prevented from maintaining a meaningful relationship with Maelen by the unreasonable act of any person or by father's economic circumstances.
 VII
A statutory ground for termination of father's parental rights having been established; the court must go on to determine whether termination of father's parental rights is in the best interest of the child.
In making this determination the court is entitled to take into account events occurring after filing of the instant petition and up to the time of trial. The deterioration of the child's condition during 1991 has been outlined above. By the end of 1991 father's visits were causing Maelen such evident distress that DCF suspended further visitation. On father's motion the court ordered a visitation supervised by Dr. Shamoo. The visit took place on May 20, 1992. Just prior to meeting with her birth parents Maelen told Dr. Shamoo she didn't want to see them. She ignored them in the waiting room, refused to acknowledge them once in the therapist's office and refused to hug them. After the visit Maelen was extremely agitated and hyper. She stated very emphatically that she didn't want to see Andy and her mother. Dr. Shamoo reported that since this visit Maelen has regressed significantly. She is angry and feels betrayed and anxious that she will be forced to live with Andy and Linda. (State's Exhibit C, Report dated June 26, 1992).
Dr. Shamoo describes the child's behavior: "Again her anxieties CT Page 2296 are exhibited by her behaviors. At the present time (June, 1992) Maelen is not only wetting the bed but also wetting the floor, because of bad dreams she wakes up and roams the house at night, she is now resistant to going to sleep because of these bad dreams, head banging is occurring, increased anger is displayed as well as defiant acting out. Of major concern is Maelen's sexual acting out. School behavior has also deteriorated. Her teacher reported that she has become aggressive toward her peers, and is having behavior difficulty on the bus."
Dr. Shamoo testified that Maelen looks to her foster mother to provide daily care. Dr. Shamoo predicted that further attempts to reunite Maelen with her father would result in the same behaviors but increased. Dr. Mantell saw no evidence of a parent to child relationship. Mantell felt it would be detrimental to the child's best interest to allow further time to pass for the reestablishment of a parent to child relationship. To do so would risk undoing the security tie which Maelen has with her foster family. Mantell sees this tie as essential to the child's welfare.
While Andrew W. blames others for the loss of his relationship with Maelen the court is persuaded that his rigidity, suppressed anger and poor judgment have contributed significantly to this loss and to the failure of his visitations with Maelen. His limitations do not inspire confidence that he would be any more successful in future efforts to reestablish a parent-child relationship with Maelen.
Maelen is adoptable. Her foster parents are interested in adopting her. The court is persuaded that further efforts to reestablish a parent-child relationship between Maelen and her father would be unsuccessful and would be disastrous to the child. She desperately needs the security of a permanent home with the F.s.
The court finds, by clear and convincing evidence that it is in the best interest of Maelen that her father's parental rights be terminated.
Accordingly, the parental rights of Andrew W. in and to his daughter, Maelen Z. are hereby terminated. The Commissioner of the Department of Children and Families is appointed statutory parent for the purpose of arranging for Maelen's adoption. The Commissioner is to file a case plan within ninety days of this decision as required by statute, and thereafter shall report the court on implementation of the plan every twelve months or until the child's adoption is finalized.
DOWNEY, J. CT Page 2297
[EDITORS' NOTE: THIS PAGE IS BLANK.] CT Page 2298